UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:21-CR-15 JD |
| SHAMOND JENKINS | |

**OPINION AND ORDER**

Defendant Shamond Jenkins was indicted for his alleged involvement in a string of three armed robberies that took place in December 2020 and January 2021. The indictment grew out of efforts by FBI agents and local law enforcement officers to gather information and identify potential suspects in the robberies. Mr. Jenkins quickly became the main suspect and law enforcement officials applied for a search warrant of an apartment Mr. Jenkins was known to frequent. The agents and officers had the apartment complex under surveillance while they were applying for the warrant and during that surveillance saw Mr. Jenkins get in a car and leave the complex. State troopers on the surveillance perimeter stopped the car Mr. Jenkins was in and subsequently performed a search. They found a handgun and a large sum of cash with a bait bill connected to the second of the three robberies. They also took statements from Mr. Jenkins and two other individuals who had been in the car. Mr. Jenkins now moves the Court to suppress all the evidence and statements the authorities gathered from the stop. For the following reasons, the Court denies Mr. Jenkins's motion.

**I.      Factual Background**

The series of events that eventually led to Shamond Jenkins's indictment began on December 17, 2020, when a lone individual entered a Check Into Cash store in Mishawaka,

brandished a gray over black semi-automatic handgun, and told the store employee he would kill her if she didn't hand over the cash from the store's safe. The employee handed the money over and the robber fled. Store surveillance video captured the robbery. When FBI Special Agent Thomas Weber viewed the tape, he noticed that the robber appeared to be a young adult male, was wearing a black puffy winter jacket with a logo on the sleeve, had distinctive red and white pants on, and was wearing two surgical masks, one covering the lower part of his face and the other covering the front of his throat.

On December 29, authorities learned of another robbery, this time at the Centier Bank located in the South Bend Meijer grocery store. The robber did not show a gun but instead slipped a note to a bank teller that demanded money and threatened to kill the teller if she did not comply. The teller followed the robber's directions and the robber fled with cash in a gray Walmart bag. Bank surveillance again captured the robbery. Agent Weber reviewed that video and noticed that this robber appeared to be the same young male from the earlier robbery. The individual in this second robbery had the same facial features, what appeared to be the same type of black puffy coat, and the same combination of surgical masks over his face and neck.

A third robbery then occurred on January 7, 2021. This robbery involved two males who entered a Centier Bank in Mishawaka, demanded money from the employees, and threatened to kill the employees if they did not comply. One of the robbers gave the bank employee a gray Walmart bag to fill with money, the employee complied, and the two robbers fled. The robbery was again caught on surveillance video and Agent Weber, upon reviewing the video, again noticed physical similarities that led him to believe one of the individuals was the same person who committed the two prior robberies.

Agent Weber soon learned of Mr. Jenkins from local authorities he had been working with to investigate the string of robberies. His investigation into Mr. Jenkins showed that local authorities knew him from an armed robbery that occurred in May 2019, that he was a physical match with the individual seen in all three robbery surveillance videos, and that he had a prominent tattoo of the Olympic rings on the front of his neck in the area the robber had covered with facemasks and other clothing during the robberies. Agent Weber also found photos and video of Mr. Jenkins online that showed him wearing the distinctive red and white pants seen in the video of the first robbery and a black puffy coat that matched the one seen in the robberies. Agent Weber further learned that Mr. Jenkins had been arrested for possession of a firearm in Grand Rapids on December 23, in between the first and second robberies, and that police had taken a silver and black handgun from Mr. Jenkins at that time.

    Having identified a likely suspect, Agent Weber and other authorities compiled an application for a search warrant on January 8 of Mr. Jenkins's girlfriend's apartment in the Castle Point apartment complex where Mr. Jenkins was known to stay. At the same time certain investigators and officers were compiling and applying for the search warrant that day, others, including Indiana state troopers, FBI agents, and local police officers, were surveilling the apartment complex in anticipation of receiving the warrant. FBI agents had briefed the law enforcement team doing the surveillance about Mr. Jenkins's suspected robberies and the fact they were applying for a search warrant. Some of the law enforcement officers were located directly in and around the apartment complex while others were positioned farther away to form a wider perimeter. While conducting the surveillance, the officers closer to the apartment saw Mr. Jenkins and a female who would later be identified as Mr. Jenkins's girlfriend, Camyla Walton, walk out of the apartment complex and enter a gray Ford sedan being driven by a third

person. Authorities would later discover the driver was Raven Greer, who did not know either Mr. Jenkins or Ms. Walton, was being paid to drive them, and had smoked marijuana in her car approximately half an hour before arriving to pick them up.

After seeing Mr. Jenkins and Ms. Walton get in the car, the nearby officers radioed to the officers positioned on the wider perimeter to inform them that Mr. Jenkins was riding in the gray Ford westbound on Cleveland Road away from the apartment complex. State Trooper Kyle Glaze, who had been briefed on Mr. Jenkins's suspected crimes and had seen pictures of Mr. Jenkins, was one of the waiting officers who heard the radioed message. He began driving on Cleveland Road west of the apartment complex to try to locate the gray Ford. He located a car stopped at the intersection of Cleveland and Juniper Roads that matched the description he had heard and that had an individual sitting in the front passenger seat who appeared to match Mr. Jenkins's physical description. As he pulled up behind the car, he stated he saw the car move from one of two westbound lanes into the intersection's left-hand turn lane without using its turn signal. Trooper Glaze then followed the car through a left turn at the intersection onto Juniper Road and again noticed the car didn't use a turn signal. Finally, he paced the car as it accelerated on Juniper Road and observed it going 42 miles an hour in the 30 mile-per-hour zone.

Trooper Glaze was initially the only law enforcement official to have located the Ford, but Troopers Kyle Hudson and David Caswell joined Trooper Glaze in following Ms. Greer's car by the time it began traveling on Juniper Road. After a little less than a mile, Trooper Glaze activated his lights and pulled the Ford over. Troopers Hudson and Caswell, along with at least one other officer, also pulled over to assist with the stop. Because of the potential danger Mr. Jenkins could have posed as a suspected armed robber, the troopers treated the stop as a high risk stop and ordered the car's occupants out with their guns drawn. As the troopers supervised the

4

passengers' exit from the car, Trooper Caswell used his trained police dog to perform a sniff around the car. The dog alerted for drugs at the front passenger door and the troopers searched the car. Ms. Greer additionally gave the officers permission to search the car. The troopers found a handgun underneath the front passenger seat where Mr. Jenkins had been sitting, a baggie with marijuana residue in the front of the car, and a purse belonging to Ms. Walton that had $5,300 in cash inside. The cash included a $20 bait bill traceable to the second robbery.

Following these discoveries, troopers and other officers took statements from Ms. Greer, Ms. Walton, Ms. Walton's mother because Ms. Walton was a minor, and Mr. Jenkins. Mr. Jenkins moved to suppress the evidence obtained from the stop. (DE 24.) Because the motion raised certain factual issues, the Court held an evidentiary hearing during which it received evidence and heard testimony from the law enforcement officers involved in the investigation and stop as well as from Ms. Greer and Ms. Walton.

**II.     Discussion**

Mr. Jenkins's motion rests on his contention that the investigatory stop was warrantless, not supported by probable cause, and thus illegal. (DE 24 at 1.) The Government countered that the stop was justified for two reasons. First, because Trooper Glaze observed Ms. Greer commit three traffic infractions that gave him probable cause for the stop. And second, because Trooper Glaze had sufficient reasonable suspicion for the stop based on the information authorities had gathered and shared connecting Mr. Jenkins to the string of robberies and the gray Ford. (DE 26 at 7–10.) The Court considers both bases in this order with the understanding that the Government bears the burden of proving by a preponderance of the evidence that the stop was justified. *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011).

*A.     Traffic violations*

Both the Government and Mr. Jenkins agree that an officer has probable cause to stop a vehicle if he sees the vehicle violate a traffic law. *See United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). They disagree, however, about whether Ms. Greer violated any traffic laws. The Government argues there were three violations, two failures to signal and one instance of speeding. Ind. Code § 9-21-8-25; Ind. Code § 9-21-5-2; (DE 26 at 7–8). Mr. Jenkins argues there were none. (DE 24 at 5; DE 28 at 1–2.) Presented with this factual dispute, the Court looks to the testimony offered at the evidentiary hearing for a resolution.

The testimony supports the Government's contention that there were three traffic violations justifying the stop. The Court found Trooper Glaze's testimony, which was confident, direct, and thorough, particularly compelling in reaching this finding. Trooper Glaze had approximately six years of experience as a state trooper at the time of the stop. That experience involved specific training on patrol duties, including monitoring traffic and conducting traffic stops, and his regular daily assignment over that time was to do road patrols. He thus appears to have been well-qualified to identify and assess traffic violations. He explained that he had a clear view of the two turn signal infractions when they occurred because he was driving up behind Ms. Greer as she changed lanes and was following directly behind Ms. Greer as she was turning left. He additionally explained that he used his experience with pacing and his car's speedometer, as well as his training as a state trooper that allows him to estimate a vehicle's speed by observation alone, to determine Ms. Greer had been speeding. While Mr. Jenkins's counsel attempted to raise some doubt during the hearing as to how accurate the pacing itself was, the Court finds that Trooper Glaze's additional training on estimating vehicle speed and Trooper Hudson's testimony

6

that he had to drive at between 40 and 42 miles per hour to keep up with Trooper Glaze and Ms. Greer as they drove on Juniper Road corroborate Trooper Glaze's pacing and indicate Ms. Greer was speeding.

Mr. Jenkins's counsel also raised credibility concerns based on potential inconsistencies in other parts of Trooper Glaze's testimony. But the Court does not find those concerns minimize Trooper Glaze's reliability. First, Trooper Glaze estimated during his testimony that it took him approximately ten seconds from the time he pulled Ms. Greer's car over to begin ordering Mr. Jenkins and the other individuals out of the car, which Mr. Jenkins's counsel argued was far too fast. While ten seconds may have been somewhat of a short time frame, Trooper Hudson estimated it took approximately 20 seconds and Trooper Caswell also testified that the events after the stop occurred quickly, which convinces the Court that Trooper Glaze's recollection was sound. Second, there were concerns raised that Trooper Glaze may have embellished about being able to see Mr. Jenkins in the front seat of Ms. Greer's vehicle given that the stop occurred later in the day and that Trooper Glaze had a poor angle from behind Ms. Greer's car to identify someone in the passenger seat. The Court does not find Trooper Glaze embellished or that his testimony should be discounted based on this fact, however, because he was clear during the hearing that he only believed he saw someone in the passenger seat who was generally consistent with Mr. Jenkins's physical description, not that he specifically saw Mr. Jenkins. And the time of day and angle of view as described during the hearing suggests Trooper Glaze would have been able to make that generalized assessment. The Court thus finds Trooper Glaze's testimony reliable and that there is a sufficient basis to conclude the traffic violations occurred.

The testimony from Ms. Greer and Ms. Walton, the only witnesses from the evidentiary hearing who contradicted Trooper Glaze's account, does not convince the Court otherwise. With

respect to Ms. Greer, while she was driving the car and would thus usually have a good sense of whether she was abiding by the relevant traffic laws, the Court notes she admitted to smoking marijuana in her car approximately half an hour before driving. That admission undermines her credibility as she was likely impaired at the time she claims to remember using her turn signal and staying within the speed limit. Further, her testimony consisted primarily of one-word answers without elaboration and the few explanations she gave did little to bolster her credibility, such as when she said she was positive she had not committed any infractions "because [she] was driving." Ms. Walton's testimony was similarly unpersuasive. While she claimed not to have seen any infractions, she admitted her positioning in the car put her directly behind Ms. Greer so that she could not see the car's turn signal, the speedometer, or generally what Ms. Greer was doing as she drove the car. Additionally, Ms. Walton gave highly suspect and evasive testimony about the $5,300 in cash, which included a bait bill from the second robbery, that was recovered from her purse. The Court thus finds the evidence shows there were traffic violations and that Trooper Glaze had probable cause to execute the stop.

While Mr. Jenkins did not specifically challenge the legality of the search of the car that followed the stop, the Court also explores the search's legality for completeness. As was confirmed through testimony at the evidentiary hearing, Trooper Caswell brought out his trained police dog soon after Trooper Glaze executed the stop and performed a dog sniff around the car. A dog sniff performed in conjunction with a traffic stop does not violate the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005). The trained dog quickly alerted for drugs at the front passenger door of the car where Mr. Jenkins had been sitting, which gave the troopers probable cause to execute a search. *See United States v. Simon*, F.3d 820, 833 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 824 (2020) ("A dog's alert on a car can give probable cause to search the

entire car"). Ms. Greer additionally testified that she gave the troopers permission to search the car. And during that search, the troopers found the handgun under the seat in which Mr. Jenkins had been sitting, Ms. Walton's purse, and a baggie with marijuana residue. The troopers were justified in opening Ms. Walton's purse as there could have been drugs inside, so the fact the troopers actually found the large sum of cash instead is not grounds for a challenge from Mr. Jenkins. *See Wyoming v. Houghton*, 526 U.S. 295 (1999); *see also Rawlings v. Kentucky*, 448 U.S. 98 (1980) (explaining a defendant generally has no interest in another's purse). The Court thus concludes the search following the stop was also legal and justified.

Having considered the evidence about the traffic infractions, the stop, and the subsequent search, the Court finds no basis to suppress any of the legally obtained evidence Mr. Jenkins identified in his motion. Despite that conclusion, the Court still moves to consider the Government's additional argument, that the challenged stop was also independently justified by reasonable suspicion.

### B.     *Reasonable suspicion*

The Government's reasonable suspicion argument asserts that the authorities had gathered and shared enough evidence tying Mr. Jenkins to the string of armed robberies to give Trooper Glaze reasonable suspicion to pull the vehicle over for an investigatory stop even without the traffic violations. (DE 26 at 8–9.) Mr. Jenkins countered that the stop was not justified by reasonable suspicion because it "went far beyond what was allowed under a Fourth Amendment reasonableness and balancing test with respect to a past, completed crime." (DE 28 at 8.)

Law enforcement officers can conduct brief, investigatory stops if they have reasonable suspicion that a crime is about to be or has been committed. *United States v. Street*, 917 F.3d

586, 593 (7th Cir. 2019). Reasonable suspicion requires more than a hunch but less than probable cause and must be based on specific, articulable facts, which, judged in light of the officers' experience, would justify the intrusion. *Id.* A court determining whether a stop was reasonable "must consider the totality of the circumstances known to the officer at the time of the stop." *Id.* (internal quotations omitted). This test leaves the officer's subjective reasons for the stop aside and instead objectively considers the facts available to the officer. *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (citing *United States v. Tilman*, 19 F.3d 1221, 1224 (7th Cir. 1994)).

While most caselaw deals with reasonable suspicion supporting a stop to investigate a crime that has yet to occur, the Supreme Court has made clear reasonable suspicion can also support a stop to investigate an already completed crime. *United States v. Hensley*, 469 U.S. 221, 229 (1985). The Supreme Court in *Hensley* intentionally left open the question of whether reasonable suspicion could support investigatory stops of all past crimes though. It instead restricted its holding to the facts of the case before it, stating that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony" then a stop could be made. *Id.* at 229. The Seventh Circuit has since clarified and expanded on *Hensley* though, holding more generally that "officers can stop and detain a suspect for reasonable suspicion that the suspect has engaged in a completed felony." *Bullock*, 632 F.3d at 1014.

The Court finds the totality of the circumstances show there was reasonable suspicion to support the investigatory stop here. It makes this finding despite Trooper Glaze's testimony during the evidentiary hearing that he did not believe he had reasonable suspicion. A reasonable suspicion analysis is objective in nature and thus leaves an officer's subjective views as to why

he conducted the stop aside. *See Bullock*, 632 F.3d at 1012 ("The officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry.").

Trooper Glaze was aware of specific and articulable facts that under the circumstances made the stop reasonable. As one of the law enforcement officials participating in the surveillance, he received an FBI briefing on Mr. Jenkins in which he was shown pictures of Mr. Jenkins, learned about Mr. Jenkins being a suspect in the three prior armed robberies, and learned that Mr. Jenkins was thought to be staying in the apartment. He also learned that the FBI was applying for a search warrant of the apartment, which suggested they believed they had sufficient evidence to meet the higher probable cause standard. That information, combined with the information he later heard over the radio, namely that Mr. Jenkins had been seen getting into a gray Ford that then started traveling westbound on Cleveland Road away from the apartment complex, and his own subsequent observation of a gray Ford on Cleveland Road west of the apartment complex with an individual in the passenger seat who was consistent with Mr. Jenkins's physical description, gave him reasonable suspicion to execute the investigatory stop.

Trooper Glaze also properly acted on that reasonable suspicion with the stop he made as the degree of intrusion that the stop caused for Mr. Jenkins was not unreasonable under the circumstances. The Court first notes that the stop itself was not long. It only lasted for the short amount of time it took the troopers to remove the vehicle occupants and perform a dog sniff. Most of the time Mr. Jenkins was detained was instead attributable to the ensuing search and subsequent investigation after the dog alerted on the car and gave the troopers probable cause to search and investigate further.

Additionally, there were strong governmental interests at play based on the known facts at the time the stop occurred. Trooper Glaze and the other officers knew Mr. Jenkins was the

main suspect in a string of armed robberies. They thus had a high interest in crime prevention despite the lack of an ongoing crime, particularly because the last of the three robberies had occurred only the day before and the crimes had already proved to be serial in nature. Further, Trooper Glaze and the other officers knew Mr. Jenkins was at the center of the developing investigation around the apartment and thus had an interest, based on that knowledge, in ensuring he remained within the reach of the authorities. *See, e.g.*, *Bullock*, 632 F.3d at 1014 (recognizing the governmental interest in detaining a key suspect in an already committed crime when a search warrant is being executed). Finally, the decision to wait to conduct the stop away from the apartment complex was reasonable as it supported the interest in avoiding the risk that another person of interest might see the authorities were closing in on the apartment complex. Considering the totality of the circumstances surrounding the stop, including the known facts and the governmental interests, the Court concludes the stop, though related to a completed crime, was supported by reasonable suspicion.

### III.  Conclusion

For the foregoing reasons, the Court DENIES Mr. Jenkins's motion to suppress (DE 24).

SO ORDERED.

ENTERED: August 16, 2021

                                                    /s/ JON E. DEGUILIO
                                                  Chief Judge
                                                  United States District Court